HOWARD, Circuit Judge,
dissenting.
Undoubtedly, most of us would prefer that the information stored in our cell phones be kept from prying eyes, should a phone be lost or taken from our hands by the police during an arrest. One could, individually, take protective steps to enhance the phone’s security settings with respect to that information, or for that matter legislation -might be enacted to make such unprotected information off-limits to finders or to the police unless they first obtain a warrant to search the phone. But the question here is whether the Fourth Amendment requires this court to abandon long-standing precedent and place such unprotected information contained in cell phones beyond the reach of the police when making a custodial arrest. I think that we are neither required nor authorized to rule as the majority has.
Instead, this case requires us to apply a familiar legal standard to a new form of technology. This is an exercise we must often undertake as judges, for the Constitution is as durable as technology is disruptive. In this exercise, consistency is a virtue. Admittedly, when forced to confront the boundaries not only of the Fourth Amendment, but also of the technology in question, it is not surprising that we would look beyond the case at hand and theorize about the long-term effects of our decision. Yet the implications of our decisions, while important, are ancillary to our *15 constitutionally defined power to resolve each case as it appears before us. Having scrutinized the relevant Supreme Court decisions, as well as our own precedent, I find no support for Wurie’s claim that , he had a constitutional right protecting the information obtained during the warranty less search. Nor do I believe that we possess the, authority to create such a right. Therefore, I respectfully dissent.
The facts are clear: the police conducted a valid custodial arrest of Wurie; the cell phone was on Wurie’s person at the time of the arrest; after seeing repeated calls to Wurie’s cell phone from “my house,” the police flipped it open and, pressing two buttons, retrieved the associated number.
We have long acknowledged that police officers can extract this type of information from containers immediately associated with a person at the time of arrest. In United States v. Sheehan, 583 F.2d 30 (1st Cir.1978), police arrested a suspected bank robber and then searched his wallet, which included a piece of paper bearing several names and telephone numbers. Id. at 30-31. The police officers copied this piece of paper, which action Sheehan challenged as an unconstitutional seizure. The claim is made that Sheehan is inapposite to the present case because it concerned a challenge to the seizure, not the search. We, however, did not address the warrantless search in Sheehan because its legality was beyond dispute. Judge Coffin, for the court, noted as an initial matter that “[a]p-pellant concedes, as he must, that his arrest was lawful and that therefore the search of his wallet was legal.” Id. (emphasis added). It is not as though Shee-han left- the legality of the search unresolved; rather, the court considered the issue uncontroversial, and therefore provided no elaboration. See also United States v. Uricoecheof-Casallas, 946 F.2d 162, 165-66 (1st Cir.1991) (upholding the warrantless search of a wallet incident to a custodial arrest).
Sheehan was no outlier. Courts have regularly upheld warrantless searches of nearly identical information in a range of “containers.” E.g., United States v. Ortiz, 84 F.3d 977, 984 (7th Cir.1996) (telephone numbers from a pager); United States v. Rodriguez, 995 F.2d 776, 778 (7th Cir-. 1993) (address book kept inside a wallet); United States v. Molinaro, 877 F.2d-1341, 1346-47 (7th Cir.1989) (phone numbers dn slips of paper found in a wallet); United States v. Holzman, 871 F.2d 1496, 1504-05 (9th Cir.1989) (address book), abrogated on other grounds by Horton v. California, 496 -U.S. 128, 110- S.Ct. 2301, 110 L.Ed.2d 112 (1990).
The police officers’ limited search of one telephone number in Wurie’s call log was even less intrusive than the searches in these cases. The police observed, in plain view, multiple calls from “my house” — a shorthand similar to what millions of cell phone owners use to quickly identify calls instead of the number assigned by the service provider — to Wurie’s cell phone. Only thén did they initiate their search and only for the limited púrpose of retrieving the actual phone number associated with “my house.” The police did not rummage through Wurie’s cell phone, unsure of what they could find. Before they had even begun their search, they knew who was calling Wurie and how many times the person had cálled. The additional step of identifying the actual telephone number hardly constituted a further intrusion on Wurie’s privacy interests, especially sihce •that information is immediately known to the third-party telephone company. See United States v. Flores-Lopéz, 670 F.3d 803, 807 (7th Cir.2012) (holding that the police could retrieve an arrestee’s cell phone number from his phone without a warrant, in part, because “the -phone com *16 pany knows a phone’s number as soon as the call is connected to the telephone network; and obtaining that information, from the phone company isn’t a search because by subscribing to the telephone .service the user , of the phone is deemed to surrender any privacy interest he may have had in his phone number”) (citing Smith v. Maryland, 442 U.S. 735, 742-43, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)); ■ see also Matthew E. Orso, Cellular Phones, Warrantless Searches, and the New Frontier of Fourth Amendment Jurisprudence, 50 Santa Clara L. Rev. 183, 210 (suggesting a rule that permits the warrantless search of “call lists and text message addressees” pursuant to an arrest). This case fits easily within existing precedent.
Nor are there any other persuasive grounds for distinguishing this case from our previous decisions. That the container the police searched was a cell phone is not, by itself, dispositive, for “a constitutional distinction between ‘worthy’ and ‘unworthy’ containers would be improper.” United States v. Ross, 456 U.S. 798, 822, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). We made a similar observation in United States v. Eatherton, 519 F.2d 603 (1st Cir. 1975), where we upheld the warrantless search of a briefcase incident to an arrest. Id. at 610-11. We recognized that a briefcase had some unique characteristics, but explicitly rejected any analysis turning on the nature of the searched container: “While a briefcase may be a different order of container from a cigarette box, it is not easy to rest a principled articulation of the reach of the fourth amendment upon the distinction____[W]hile [such a distinction] may have analytical appeal, it does not presently represent the law.” Id. at 610 (citations omitted).
Even assuming that cell phones possess unique attributes that we must consider as part of our analysis, none of those attributes are present in this case. Though we do not know the storage capacity of Wur-ie’s cell phone, we know that the police did not browse through voluminous data in search of general evidence. Nor did they search the “cloud,”[14] or other applications containing particularly sensitive information. Instead, they conducted a focused and limited search of Wurie’s electronic call log. If the information that they sought had been written on a piece of paper, as opposed to stored electronically, there would be no question that the police acted constitutionally, so I see no reason to hold otherwise in this case. The constitutionality of a search cannot turn solely on whether the information is written in ink or displayed electronically.
The issue of warrantless cell phone searches has come before a number of circuits. E.g., Flores-Lopez, 670 F.3d at 803-10; United States v. Curtis, 635 F.3d 704, 712 (5th Cir.2011); Silvan W. v. Briggs, 309 Fed.Appx. 216, 225 (10th Cir. 2009) (-unpublished); United States v. Murphy, 552 F.3d 405, 411 (4th Cir.2009). None of them have adopted the majority’s categorical bar on warrantless cell phone searches. Instead, they unanimously have concluded that the cell phone searches before them did not violate the Fourth Amendment.
I reach the same conclusion here. Wur-ie’s cell phone was on his person at the time of the arrest. The information that the police looked at was of a character that we have previously held searchable during *17 a custodial arrest. Wurie has made no convincing argument for why this search is any different than the search for phone numbers kept in a wallet or an address book. Thus, I see no reason to look for complications where none exist; Wurie has not shown a violation of his Fourth Amendment rights.
In.my view, there is another rationale, apparent from the record, for upholding this search: the risk that others might have destroyed evidence after Wurie did not answer his phone. Wurie received repeated calls from “my house” in the span of a few minutes after his arrest. His failure to answer these phone calls could have alerted Wurie’s confederates to his arrest, prompting them to destroy further evidence of his crimes. The majority asserts that this scenario would be present “in almost every instance of a custodial arrest,” giving police an ever-ready justification to search cell phones., Swpra at 11 n. 11. On the contrary, the justification is based on the specific facts of this case. The fact that “my house” repeatedly called Wurie’s cell phone provided an objective basis for enhanced concern that evidence might be destroyed and thus gave the police a valid reason to inspect the phone. See Chimel v. California, 395 U.S. 752, 762-63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).
This additional reason for affirmance is not a novel one. United States v. Gomez, 807 F.Supp.2d 1134 (S.D.Fla.2011), presents a comparable example. In that case, police officers, after observing multiple phone calls from the same number to an arrested drug dealer’s cell phone, first answered the ringing cell phone and thereafter communicated to the caller via text message while posing as the arrestee, which led to the discovery of additional evidence. Id. at 1139. The district court denied a motion to suppress this evidence, holding the police acted according to “the exigencies commensurate with the Defendant’s ringing cell phone.” Id. at 1152; see also United States v. De La Paz, 43 F.Supp.2d 370, 375-76 (S.D.N.Y.1999) (admitting evidence — under the exigent circumstances exception — obtained . when the police answered an arrestee’s cell phone and heard multiple callers identify the ar-restee by his drug dealer moniker). The police action in this case is analogous— arguably less invasive — and a further reason why Wurie’s constitutional challenge founders on the specific facts of this case.
Granted, my fact-specific view does not comport with the all-or-nothing approach adopted by the majority and some state courts, see Smallwood v. State, No. SC111130, 113 So.3d 724, 2013 WL 1830961 (Fla. May 2, 2013);' State v. Smith, 124 Ohio St.3d 163, 920 N.E.2d 949 (2009). But I find the competing rationale unpersuasive.[15] Most pointedly, for the reasons explained above, Wurie himself Suffered no constitutional violation during the search. If we are to fashion a rule, it cannot elide the facts before us. “The constitutional validity of a warrantless search is preeminently the sort of question which can only ,be decided in the concrete factual *18 context of the individual case.” Sibron v. New York, 392 U.S. 40, 59, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). Yet the competing analysis focuses on hypothetical searches that, have not emerged in any case or controversy before this court. Those scenarios may one day form the basis of our reasoning in another case, but they cannot govern our analysis of Wurie’s claim.
The majority gets around this problem by requiring the government to “demonstrate that warrantless cell phone searches, as a category, fall within the boundaries laid out in Chimel.” Supra at 7. It cites United States v. Chadwick, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), abrogated oh other grounds by California v. Acevedo, 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991), and Arizona v. Gant, 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009), to support this approach. The Supreme Court did hold on those two occasions, neither of which involved the search of items held by the arrestee, that certain types of searches require a warrant because they lack any Chimel justification. But the Supreme Court has not extrapolated from those cases a general rule that the government justify each category of searches under Chimel, nor a requirement that the appellate courts conduct this sort of analysis.
Indeed, if the Supreme Court wishes us to look at searches incident to arrest on a categorical basis, it is curious that the Court has offered absolutely no framework for defining what constitutes a distinct category. Each arrest has its own nuances and variations, from the item searched (as in this case) to the officer’s control over it (as was the case in Chadwick), and there could be infinite distinct categories of searches based on these variations. Yet no relevant criteria are articulated for establishing these categories. That is not a good way to impose this new paradigm, under which every arrestee is now invited to argue that his search falls into some distinct category and therefore must be justified under Chimel.
Thus, either we are drastically altering the holding in United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), by forcing the government to provide a Chimel rationale for practically every search, or we are putting ourselves in the position of deciding, without any conceptual basis, which searches are part of a distinct “category” and which are not. This runs the risk of spreading confusion in the law enforcement community and multiplying, rather than limiting, litigation pertaining to these searches.
It is argued that the categorical approach flows from the Supreme Court’s opinion in Gant, which reaffirmed “the fundamental principles established in the Chimel case regarding the basic scope of searches incident to lawful custodial arrests.” Gant, 556 U.S. at 343, 129 S.Ct. 1710 (quoting New York V. Belton, 453 U.S. 454, 460 n. 3, 101 S.Ct. 2860; 69 L.Ed.2d 768 (1981)). Gant did take a categorical, Chimel-based approach to the search in question, but its usefulness for our analysis should not be' overstated.
As the government points out, the Supreme Court cases treat searches of the arrestee and the items on the arrestee- — as is the case here — as either not subject to the Chimel analysis, or at least subject to a lower level of Chimel scrutiny. These cases, unlike Chimel and Gant, are on point with Wurie’s case, and we are not free to disregard them in favor of the principles enunciated in Gant. As an inferi- or court, we are cautioned against “concluding] [that] more recent cases have, by implication, overruled an earlier precedent. ... [I]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line *19 of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.” Agostini v. Felton, 521 U.S. 208, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (internal quotation marks and alterations omitted).
In Robinson, the Supreme Court drew a sharp distinction between two types of searches pursuant to an arrest: searches of the arrestee and searches of the area within his control. “The validity of the search of a person incident to a lawful arrest has been regarded as settled from its first enunciation, and has remained virtually unchallenged.... Throughout the series of cases in which the Court has addressed the second [type of search,] no doubt has been expressed as to the unqualified authority of the arresting authority to search the person of the arrestee.” Robinson, 414 U.S. at 224-25, 94 S.Ct. 467. The Supreme Court did state that the basis of this authority is “the need to disarm and to discover evidence,” id. at 235, 94 S.Ct. 467, but in the next sentence clarified that “[a] custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification,” id.
Indeed, the Court could not rely, on a Chimel justification in Robinson, as the arresting officer conceded that he “did not in fact believe that the object in [Robinson]’s coat pocket was a weapon” and that he gave no thought to the destruction of evidence either. Id. at 251, 94 S.Ct. 467 (Marshall, J., dissenting) (quoting the arresting officer’s testimony: “I didn’t think about what I was looking for. I just searched him.”). Robinson may not have rejected Chimel in the context of searches of an arrestee and items on the arrestee, but it did establish that these searches differ from other types of searches incident to arrest.
The Supreme Court reiterated Robinson ’s'holding in United States v. Edwards, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), in which the Court upheld' the search and seizure of an arrestee’s clothing ten hours after he was arrested. While most of the analysis focused on the timing of the search, the opinion assumed that law enforcement could “tak[e] from [the arrestee] the effects in his immediate possession that constituted evidence of crime. This was and is a normal incident of a custodial • arrest____” Id. at 805, 94 S.Ct. 1234; see also id. at 803, 94 S.Ct. 1234 (“[B]oth the person and the property in his immediate possession may be searched at the station house after the arrest has occurred....”). Once again, the Supreme Court was unconcerned with the existence or nonexistence of Chimel rationales. The opinion barely discussed them, and the government did not seek to prove that they were present. Id. at 811 n. 3, 94 S.Ct. 1234 (Stewart, J., dissenting) (“No claim is made that the police feared that Edwards either possessed a weapon or was planning to destroy the paint chips on his clothing. Indeed, the Government has not even suggested that he was aware of the presence of the paint chips on his clothing.”).
Even in Chadwick, where the Supreme Court did require the police- to obtain a warrant for a category of searches, it continued to treat the search of an arrestee and items immediately associated with him as independently justified by “reduced expectations of privacy caused by the arrest.” Chadwick, 433 U.S: at 16 n. 10, 97 S.Ct. 2476. Thus, the holding in Chadwick applied only to “luggage or other personal property not immediately associated with the person, of the arrestee.” Id. at 15, 97 S.Ct. 2476 (emphasis added). These cases, *20 taken together, establish that items immediately associated with the arrestee — as a category — may be searched without any Chimel justification. The majority seeks a bright-line rule to govern cell phone searches, but denies the fact that such a rule — covering all items on the arrestee’s person — already exists.
But even if searches of items on an arrestee required Chimel justifications, I cannot see why cell phones fail to meet this standard if wallets, cigarette packages, address books, briefcases, and purses do. The attempt is made to distinguish cell phones from these other items, but those distinctions do not hold up under scrutiny.
One argument is that these other items, unlike cell phones, all theoretically could contain “destructible” evidence, which justifies examining them. But the evidence in a cell phone is just as destructible as the evidence in a wallet: with the press of a few buttons, accomplished even remotely, cell phones can wipe themselves clean of data. Any claim that the information is not destructible strikes me as simply wrong.[16] Pérhaps what is meant is that the cell phone data is no longer destructible once it is within the exclusive control of law enforcement officers. But even accepting that the likelihood of destruction is reduced to almost zero once the officers are in control of a cell phone, this is equally true of cigarette packages, wallets, address books, and briefcases. Drugs do not disappear into thin air; weapons do not flee of their own accord. If that is the basis for the reasoning, then a warrant should be required before searching any object within the exclusive control of the police. I do not think that the majority is arguing for this rule, but I cannot see any other outcome under its analysis. Ironically, cell phones arguably pose a greater Chimel risk than most other items because, unlike cigarette packages or wallets, the evidence contained in cell phones remains destructible even after the police have assumed exclusive control of the phone via remote wiping.[17]
Another argument is that because cell phone searches are not “self-limiting,” they always require a warrant. The majority does not precisely define the term “self-limiting,” but I gather that it refers to the danger that cell phones, because of their vast storage capabilities, are susceptible to “general, evidence-gathering searches.” Supra at 10 (citing Thornton v. United States, 541 U.S. 615, 632, 124 S.Ct. 2127, 158 L.Ed.2d 905 (2004) (Scalia, j., concurring)). As an initial matter, this has never been the focus of Supreme Court cases discussing the search incident to arrest exception for items immediately associated with the arrestee.[18] Thus, I am *21 reluctant to give it much weight in assessing Wurie’s constitutional claim.
Nonetheless, if we are concerned that police officers will exceed the limits of constitutional behavior while searching cell phones, then we should define those limits so that police can perform their job both effectively and constitutionally. Instead, the majority has lumped all cell phone searches together, even while perhaps acknowledging that its broad rule may prohibit some otherwise constitutional searches. Swpra at 13 (“Thus, while the search of Wurie’s call log was less invasive than a search of text messages, emails, or photographs, it is necessary for all war-rantless cell phone data searches to be governed by the same rule.”). But this need not be the solution. We can draw the appropriate line ' for cell phone searches, just as we have done in other contexts. For instance, a body search, like a cell phone search, is not inherently self-limiting. A frisk can lead to a strip search, which can lead to a cavity search, which can lead to x-ray scanning. But this parade of horribles has not come to pass because we have established the constitutional line, and conscientious law enforcement officers have largely adhered to it. See Swain v. Spinney, 117 F.3d 1, 5-9 (1st Cir.1997) (holding that police officers may not conduct a strip search of an arrestee incident to the arrest); see also Roberts v. Rhode Island, 239 F.3d 107, 113 (1st Cir. 2001) (holding that indiscriminate strip searches of misdemeanant arrestees during administrative processing at a detention facility violated the Fourth Amendment). The majority has instead chosen to ignore this option in favor of a rule that sweeps too far.
Still, I share many of the majority’s concerns about the privacy interests at stake in cell phone searches. While the warrantless search of Wurie’s phone fits within one .of our “specifically established and well-delineated exceptions,” United States v. Camacho, 661 F.3d 718, 724 (1st Cir.2011) (citations omitted) (internal quotation marks omitted), due to the rapid technological development of cell phones and their increasing prevalence in society, cell phone searches do pose a risk of depriving arrestees of their protection against unlawful searches and seizures. There must be an outer limit to their legality.
In Flores-Lopez,. Judge Posner suggested that courts should balance the need to search a cell phone against the privacy interests at stake.
[E]ven when the risk either to the police officers or. to the existence of the evidence is negligible, the search is allowed, provided it’s no more invasive than, say, a frisk, or the search of a conventional container, such as Robinson’s cigarette pack, in which heroin was found. If instead of a frisk it’s a strip search, the risk to the officers’ safety or to the preservation of evidence of crime must be greater to justify the search.
Flores-Lopez, 670 F.3d at 809 (citations omitted). I believe that cell phone searches should follow this formula. That *22 is not to say that the police must prove a risk to officer safety or destruction of evidence in every case. There is, inherent in every custodial arrest, some minimal risk to officer safety and destruction of evidence. Moreover, Chadwick states that the arrest itself diminishes the arrestee’s privacy rights over items “immediately associated” with the arrestee. Chadwick, 433 U.S. at 15, 97 S.Ct. 2476. But the invasion of the arrestee’s privacy should be proportional to the justification for the warrantless search.
This approach respects “the Fourth Amendment’s general proscription against unreasonable searches and seizures.” Edwards, 415 U.S. at 808 n. 9, 94 S.Ct. 1234 (citations omitted) (internal quotation marks omitted). It is also consistent with the core reasonableness limit that has been acknowledged in Robinson, which does not permit “extreme or patently abusive” searches, Robinson, 414 U.S. at 236, 94 S.Ct. 467, and its offspring, see, e.g., Swain, 117 F.3d at 5-9: The Supreme Court’s recent opinion in Missouri v. McNeely,--U.S. -, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013), shows that the reasonableness inquiry remains a touchstone of Fourth Amendment analysis. The Court held that, in the context of warrantless blood tests of drunk drivers, courts had to look to “the totality of the circumstances” to determine whether police officers’ reliance on the exigency exception was reasonable. Id. at 1558-63.
Similarly, while Robinson’s principles generally authorize cell phone searches, and certainly encompass the search in this case, there are reasonable limits to Robinson that we should not hesitate to enforce, especially in light of a cell phone’s unique technological capabilities, for “[i]t would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology.” Kyllo v. United States, 533 U.S. 27, 33-34, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001).
I find helpful the analysis in United States v. Cotterman, 709 F.3d 952 (9th Cir.2013) (en banc). In that case, the Ninth Circuit determined whether a war-rantless forensic examination of a laptop computer during a border search violated the Fourth Amendment. The court conducted a reasonableness analysis, balancing the privacy interests of the individual against the sovereign’s interests in policing its borders. Id. at 960. It stated that, had the search only involved “turn[ing] on the • devices and opening] and view[ing] image files ... we would be inclined to conclude it was reasonable.” Id. at 960-61. However, the invasive nature of the forensics examination, which included restoring previously deleted files, as well as “the uniquely sensitive nature of data on electronic devices,” id. at 966, convinced the court that the forensics examination was an unreasonable border search absent a showing of reasonable suspicion, id. at 968.
A similar reasonableness analysis would restrain certain types of cell phone searches under Robinson. The inherent risks in a custodial arrest, along with the reduced privacy expectations of the arres-tee, must be balanced against the wide range of private data available in a cell phone. But ultimately the question of what constitutes an unreasonable cell phone search should be left for another day. The majority has outlined some of the more troubling privacy invasions that could occur during a warrantless search. So long as they remain in the hypothetical realm, I think it premature to draw the line. Suffice it to say that, for the reasons I have stated, the search in this case fell on the constitutional side of that line.[19]

I respectfully dissent.

. The government does not claim a right to conduct warrantless searches of information in the cloud. This is an important concession,. for it suggests that the government accepts that there are limits to searches of items found on custodial arrestees. I discuss my view of those limits later.

. The insistence on a bright-line rule contrasts with the recent Supreme Court opinion in Missouri v. McNeely, - U.S. --, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013), which rejected a bright line rule and instead relied on a totality of the circumstances analysis for warrantless blood tests of drunk drivers, id. at 1564 ("[A] case-by-case approach is hardly unique within our Fourth Amendment jurisprudence. Numerous police actions are judged based on fact-intensive, totality of the circumstances analyses rather than according to categorical rules, including in situations that are [] likely to require police officers to make difficult split-second judgments.”). While it can be argued that a bright-line rule is preferable, it cannot be claimed that such a rule is necessary.

. The term “destructible” evidence is perhaps intended to mean “physical” or "tangible” evidence. That distinction does not fly, for two reasons. First, just because evidence is intangible does not make it indestructible. As noted, an arrestee can delete data just as easily as he can discard drugs. Second, any distinction based on the difference between tangible and intangible evidence ignores the fact that we have upheld the warrantless search of intangible information during a custodial arrest. United States v. Sheehan, 583 F.2d 30, 31 (1st Cir.1978).

. It is also half-heartedly suggested that containers that hold physical objects, unlike cell phones, pose a risk to officer safety. “[T]he officer who conducted the search in Robinson had no idea what he might find in the cigarette pack, which therefore posed a safety risk.” Supra at 10. I find it hard to believe that a reasonable police officer is more justified in remaining on guard against booby-trapped cigarette packs and wallets in the line of duty, than she is against sophisticatéd electronic devices.

.For instance, in Robinson, the police conducted their search pursuant to a standard *21 operating procedure of the police department, which trained officers to carry out a full field search after any arrest. United States v. Robinson, 414 U.S. 218, 221 n. 2, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). That entailed "completely search[ing] the individual and inspect[ing] areas such, as behind the collar, underneath the dollar [sic], the waistband of the trousers, the cuffs, the socks and shoes ... [as well as] examining] the contents of all the pockets’ [sic] of the arrestee...." Id. (internal quotation marks omitted). Given that Robinson was arrested for a traffic violation, and that the arresting officer conceded that he felt no personal risk during-the arrest, the only conceivable purpose for this search was to gather general evidence. .

. If there had been a constitutional violation here, the application of the good faith exception would present an interesting question. Because I would find no constitutional violation, however, I do not address the government's good faith exception argument. But I disagree with the majority’s decision not to consider the good faith exception to the extent that it based that decision on the government's failure to invoke the exception before the district court. We may affirm on any basis apparent from the record. See United States v. Sanchez, 612 F.3d 1, 4 (1st Cir.2010). Of course, if the record is underdeveloped because the appellee did not present the issue to the district court, the appellee must suffer the consequences. See Giordenello v. United States, 357 U.S. 480, 488, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958) ("To permit the Government to inject its new theory into the case at this stage would unfairly deprive petitioner of an adequate opportunity to respond. This is so because in the District Court petitioner, being entitled to assume that the warrant constituted the only purported justification for the arrest, had no reason to ... adduce evidence of his own to rebut the contentions that the Government makes here for the first time.”).
Such is not the case here. The good faith exception is merely an extension of the government’s main argument that this search complied with existing law. The factual record appears sufficiently developed to allow our consideration of this argument, and the government, by raising it in its brief on appeal, gave Wurie the opportunity to respond in his reply brief. Thus, I would not bypass this argument merely because the government first raised it on appeal. See Jordan v. U.S. Dep’t of Justice, 668 F.3d 1188, 1200 (10th Cir.2011) (holding that an appellate court may affirm on an alternate ground "provided that the alternate ground is within our power to formulate and the opposing party has had a fair chance to address it”) (citations omitted) (internal ' quotation marks and alterations omitted).