Filed 4/22/15  P. v. Williams CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>JOHN WILLIAMS,<br><br>        Defendant and Appellant. | D064781<br><br><br>(Super. Ct. No. SCD242869,<br> SCD238325) |

APPEAL from a judgment of the Superior Court of San Diego County, David M. Gill, Judge.  Affirmed.

Carl Fabian, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Elizabeth M. Carino, Deputy Attorneys General, for Plaintiff and Respondent.

John Williams appeals from a judgment convicting him robbery, aggravated assault, petty theft, and other offenses.  He argues the judgment must be reversed because

(1) the police searched his cell phone without a warrant, and (2) the jury was improperly presented with prior misconduct evidence. We find no reversible error and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Defendant, age 20 at the time of the crimes involved in this case, is a member of the Lincoln Park gang. His convictions arose from two distinct instances of criminal activity in August 2012. In the first incident, defendant stole two backpacks from two victims who had joined him for a basketball game at a gym. In the second incident about two weeks later, defendant and his gang cohorts committed armed robbery and aggravated assault against several individuals who were in a parking lot walking to a party late at night.

*Theft of Backpacks*

On the afternoon of August 12, 2012, Luke Nguyen and Jordan Alexander went to a recreation center to play basketball. Defendant invited them to join in a "[p]ickup game," but defendant left while they were playing. When the gym closed shortly thereafter, Nguyen's and Alexander's backpacks were no longer on the bleachers where they had left them.

Two females at the gym (Ponsavon Kuy and Frances Perez) saw defendant with the stolen backpacks. Perez saw defendant take the backpacks while in the gym, and Kuy saw defendant with the backpacks when she and defendant were being given a ride to their homes from the gym. Kuy observed defendant looking through the backpacks, and heard him talk about selling cell phones that he found in the backpacks. Shortly after the theft, victim Nguyen saw that defendant's Twitter page contained a posting to sell an

2

iPhone which matched the iPhone that Nguyen had in his backpack. After a friend of Nguyen's sent defendant a "tweet" saying " 'Give him back his phone,' " defendant restricted his Twitter account so it was no longer open to the public.

The police found victim Alexander's identification card in defendant's bedroom during a search conducted after the robbery and assault incident that occurred about two weeks later.

*Robbery and Assault Incident*

At about 12:30 a.m. on August 26, 2012, a group of friends, including Sterling Wingo, Kyle Persinger, Amanda Wagner, and several others (the victim group), were in a parking lot walking to a party. The victim group was not affiliated with any gang. As they passed another group of people (the assailant group), a male in the assailant group made gang references, asking the victim group if they "bang," where they were from, and if they were "bloods." The victim group said no and tried to ignore the questioning. Someone in the assailant group said, " 'Hey, he's from Skyline,' " referring to a rival gang of Lincoln Park. One or more people in the assailant group then said, " 'Line it up' " or "catch a fade," which means everyone get ready to fight.

One of the males in the assailant group told Persinger to empty his pockets, and when Persinger refused, the male punched him. Another male pointed a gun at Wingo and took Wingo's jacket, watch and bracelet. Someone also hit Wingo in the chin. At some point a male in the assailant group lifted his shirt and revealed the butt of a gun. When someone in the victim group yelled " '[t]hey have a gun,' " the victim group fled the parking lot in various directions. While he was fleeing, Wingo called 911.

3

Some of the assailants caught up to Persinger and started kicking and stomping him. When Wagner tried to come to his aid, the assailants starting punching and kicking her. Persinger was able to flee while Wagner was being attacked. When the assailants stopped the attack on Wagner, a neighbor flagged down a police car to assist her.

To determine the identity of the assailants, the police conducted a curbside lineup on the night of the incident, and thereafter interviewed and showed photo lineups to various witnesses. As the result of this investigation, defendant and several other Lincoln Park gang members were identified as perpetrators. At the curbside lineup, witnesses identified Lincoln Park gang member Keshwan Degrate as the person who pointed the gun at Wingo; Lincoln Park gang member Davone Williamson as one of the people who punched Persinger; and Stephanie Wells as one of the people who assaulted Wagner.

Defendant was not among the group of potential suspects who had been apprehended and brought to the curbside lineup. However, he was subsequently identified as a perpetrator by several individuals, including victim Wagner, accomplice Wells, and a female he was dating (Bernesha Phillips). Wagner identified him in a photo lineup, and Wells and Phillips identified him and provided details of what occurred in recorded police interviews. Defendant was also depicted in a photo taken the night of the party wearing a camouflage tank top that matched a description provided by a victim.

After being identified by Wagner and Wells, defendant was arrested. During a search of defendant's person, the police found and seized his cell phone. The police searched the phone and discovered several text messages exchanged between him and Phillips that supported that he was involved in the robbery/assault incident. In text

4

messages exchanged in the hours preceding the incident, defendant told Phillips that he was supposed to fight and " 'pop somebody' " at her cousin's party that night, and when she pleaded with him not to do this, he responded that he would " 'fight only.' " In a phone conversation and text message that evening, defendant asked Phillips if she would hold his gun in her purse, but she refused.

Phillips told the police that during the party she heard talk that people from Skyline were "coming over," and at one point defendant pulled a silver handgun out of his waistband and showed it to Phillips. When defendant was outside by the parking lot near the party, he called Phillips and told her cars had "pulled up" and he thought he was going to get jumped. When word spread that a fight had started outside, Phillips rushed outside with the others and saw people getting out of cars. Phillips heard defendant ask " 'where are you from, do you bang?' " The people getting out of the cars seemed to be trying to ignore the situation and go to the party, but seconds later defendant started fighting, and then everybody was fighting.

Similarly, Wells told the police that during the party she heard defendant say he had " 'the pistol in the car.' " Later, she saw defendant start the fight outside by hitting a "boy"; Degrate then joined the assault; and defendant and Degrate "[b]eat him up." After the fight, Wells saw Degrate pass a small, silver gun to defendant, saying " 'Blood, I think I jammed it.' "

A prosecution gang expert described the criminal activities of the Lincoln Park gang and opined that the robbery and assaults were committed to benefit the gang.

5

*Jury Verdict and Sentence*

For the theft committed at the gym, defendant was charged with petty theft (victim Nguyen) and receiving stolen property (victim Alexander). For the robbery and assault incident, defendant was charged with robbery (victim Wingo), attempted robbery (victim Persinger), and assault by means of force likely to produce great bodily injury (victims Persinger and Wagner). The information included gang benefit enhancements for the robbery, attempted robbery, and assault charges, and gun use enhancements for the robbery and attempted robbery charges.

Defendant was convicted as charged. Based on the current charges, a prior serious felony conviction, a prior strike conviction, and probation revocation in another case, defendant was sentenced to a total term of 38 years eight months.

## DISCUSSION

### I. *Warrantless Search of Cell Phone*

Defendant argues the judgment must be reversed because the police violated his federal constitutional right to be free of unreasonable searches and seizures when, upon his arrest, the police detective (Rudy Castro) searched his cell phone without obtaining a warrant.

In 2011, the California Supreme Court held the police may conduct a warrantless search of a cell phone seized from a defendant's person at the time of arrest without violating the Fourth Amendment's proscription against unreasonable searches and seizures. That same year, the United States Supreme Court denied certiorari in *Diaz.* (*People v. Diaz* (2011) 51 Cal.4th 84, 88, 93, 101, cert. den. (2011) __ U.S. __ [132 S.Ct.

6

94].)  Defendant was arrested in August 2012 and the pretrial and trial proceedings occurred in 2012 and 2013.  In January 2014, the United States Supreme Court granted certiorari in an unrelated California case and a Massachusetts federal case that had reached conflicting conclusions concerning the warrantless cell phone search issue.  (See *People v. Riley* (Feb. 8, 2013, D059840) [nonpub. opn.], cert. granted Jan. 14, 2014, __ U.S. __ [134 S.Ct. 999] [applying *Diaz* to permit warrantless cell phone search]; *United States v. Wurie* (1st. Cir. 2013) 728 F.3d 1, cert. granted Jan. 17, 2014, __ U.S. __ [134 S.Ct. 999] [cell phone search requires warrant].)  The United States Supreme Court resolved the conflict in June 2014, overruling *Diaz* and holding that the search-incident-to-arrest exception to the warrant requirement did not apply to cell phones, and (absent exigent circumstances) a warrant was required before searching a cell phone seized at the time of arrest.  (*Riley v. California* (2014) __ U.S. __ [134 S.Ct. 2473, 2484-2485, 2493-2495].)

Thus, at the time of defendant's arrest and trial, the governing law in California permitted a warrantless search of a cell phone seized from a defendant's person at the time of arrest.  Understandably, at trial defense counsel did not challenge the legality of the cell phone search because such a challenge would have been futile under *Diaz*.  However, because defendant's conviction is not yet final on direct review, he is now entitled to raise this issue based on the subsequent overruling of *Diaz* by the United States Supreme Court in *Riley*.  (See *Davis v. United States* (2011) __ U.S. __ [131 S.Ct. 2419, 2430-2431] (*Davis*).)  The fact that defendant was subjected to an unconstitutional search of his cell phone does not mean he is automatically entitled to exclusion of the cell

7

phone data. (*Id*. at p. 2431.) Rather, we must determine whether he is entitled to the *remedy* of exclusion of the evidence, which, in this case, requires a consideration of the good faith exception to the exclusionary rule. (See *ibid*.)

The California Supreme Court has granted review to consider the question of whether the good faith exception to the exclusionary rule should apply to warrantless cell phone searches conducted at a time when *Diaz* was the controlling authority. (*People v. Macabeo*, review granted Nov. 25, 2014, S221852 [good faith exception applies].) As we shall explain, pending a decision on this issue from our state high court, we conclude the good faith exception does apply.

In *Davis*, the United States Supreme Court evaluated the applicability of the good faith exception in a case involving a change in the law concerning the permissibility of automobile searches incident to arrest. *Davis* held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." (*Davis, supra*, 131 S.Ct. at pp. 2423-2424, 2426-2429.) The *Davis* court explained that the exclusionary rule is not a personal constitutional right nor is it designed to redress the injury caused by an unconstitutional search; rather, its sole purpose is to deter future Fourth Amendment violations. (*Id*. at p. 2426.) "For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." (*Id*. at p. 2427.)

This cost-benefit analysis focuses on the " 'flagrancy of the police misconduct' at issue. [Citation.] . . . When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is

8

strong and tends to outweigh the resulting costs. [Citation.] But when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful [Citation] . . . ' "the deterrence rationale loses much of its force," ' and exclusion cannot 'pay its way.' " (*Davis, supra*, 131 S.Ct. at pp. 2427-2428.) *Davis* elaborated that "[p]olice practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningfu[l]' deterrence, and culpable enough to be 'worth the price paid by the justice system.' [Citation.] . . . The police [here] acted in strict compliance with binding precedent, and their behavior was not wrongful. Unless the exclusionary rule is to become a strict-liability regime, it can have no application to this case. [¶] . . . [¶] . . . [W]hen binding appellate precedent specifically *authorizes* a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities . . . ." (*Id*. at pp. 2428-2429, first bracketed material in original.)

The warrantless search of defendant's cell phone was in compliance with the California Supreme Court's holding in *Diaz*. Because the officers were authorized under *Diaz* to conduct a warrantless search of the phone, they were properly performing their duties. We note this is not a case where the law in California on cell phone searches was unsettled. (See *Davis, supra*, 131 S.Ct. at pp. 2435-2436 (conc. opn. of Sotomayor, J.).)[1]

---

[1] Justice Sotomayor stated that although the *Davis* majority held it was proper to apply the good faith exception when binding appellate precedent specifically authorized a particular police practice, the majority's holding did not resolve the question of whether the exception should be applied when the constitutionality of the search is unsettled. (*Davis, supra*, 131 S.Ct. at pp. 2435-2436 (conc. opn. of Sotomayor, J.) [suggesting that

At the time of defendant's arrest, binding California Supreme Court authority provided that Fourth Amendment constitutional protections did not require a warrant to search a cell phone seized incident to an arrest. Accordingly, the good faith exception to the exclusionary rule applies, and there is no basis to provide relief to defendant based on the change in the law.

Defendant argues we should not apply the good faith exception because the record indicates Detective Castro did not rely on *Diaz* but rather thought a warrant was required to search his cell phone. In support, he cites Detective Castro's statement to Phillips (during her recorded police interview) that the police "do search warrants on cell phones" and they had seen a text to her from defendant referring to a gun. This statement does not defeat the applicability of the good faith exception for several reasons. First, a broad statement that the police obtain search warrants for cell phone searches does not necessarily reflect a belief that warrants are required for a cell phone search *incident to an arrest*; indeed, even under *Diaz* there are a broad array of circumstances where a warrant *would* be required for a cell phone search. Second, the relevant inquiry for the good faith exception is primarily objective; i.e., whether a reasonably well trained officer would have thought the search was legal in light of all the circumstances. (See *Herring v. United States* (2009) 555 U.S. 135, 145; *Ashcroft v. Al-Kidd* (2011) __ U.S. __ [131 S.Ct. 2074, 2080]; *United States v. Madden* (10th Cir. 2012) 682 F.3d 920, 927-928.) Here, a reasonably well trained officer would have thought the warrantless search of defendant's

if constitutionality of police practice is unsettled, it might be appropriate not to apply good faith exception so that police have incentive to err on side of constitutional behavior].)

cell phone was legal under binding California Supreme Court authority. Third, to the extent a court considers whether an officer has engaged in improper conduct so as to warrant rejection of the good faith exception in a particular case (see *Herring, supra*, at p. 146), there is no bad faith demonstrated here. Detective Castro's reference to the practice of securing a warrant for cell phones does not suggest he engaged in " 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights" when he searched defendant's cell phone without a warrant. (*Davis, supra*, 131 S.Ct. at p. 2427.) Because Detective Castro's search of the cell phone complied with controlling California Supreme Court authority, there is no basis to characterize his conduct as being in bad faith.

We also reject defendant's contention that the *Diaz* decision cannot support the good faith exception because the California Supreme Court has no authority to decide a federal constitutional issue and was merely speculating about how the United States Supreme Court would view the issue. State courts are fully authorized to decide federal constitutional issues, subject to the dictates of the United States Supreme Court. (See *People v. Lessie* (2010) 47 Cal.4th 1152, 1164, 1167; *People v. Estrada* (1965) 234 Cal.App.2d 136, 145; 7 Witkin, Summary of Cal. Law (10th ed. 2005) Constitutional Law, § 112, p. 217; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, §§ 505-506, pp. 568-569.) Because the United States Supreme Court had not yet ruled on the issue of warrantless cell phone searches at the time of defendant's arrest, the California Supreme Court's decision was binding in California.

Given our conclusion that the good faith exception to the exclusionary rule applies, we need not consider the Attorney General's contention that the issue was forfeited, nor need we evaluate whether the warrantless search was a permissible probation search.[2]

II. *Counsel's Failure To Object to Uncharged Misconduct Evidence*

Defendant argues he was not provided effective representation and he was deprived of a fair trial because his counsel did not object to the admission of two statements (made by witnesses to the police during the robbery/assault investigation) that referred to his commission of other crimes. Defendant contends this evidence was inadmissible uncharged misconduct evidence, and there was no tactical reason for his counsel not to object to admission of the evidence.

The complained-of evidence consists of (1) a statement by victim Wagner during the photo lineup, and (2) a comment by defendant's accomplice Wells during her recorded police interview. As to Wagner's statement, Detective Castro testified at trial that when he showed the photos to Wagner at her father's residence, she immediately said, " 'Dad, you remember when my wallet got stolen? This is the guy that stole it.' " Wagner explained to Detective Castro that a year before the charged robbery/assault incident, she had a party at her home and her friends told her that defendant had taken her wallet. As to Wells's statement, during the recorded police interview that was played for

_____

[2]     Although we need not reach the probation search issue, we note that the officer (Detective Castro) who seized and searched defendant's cell phone testified at the preliminary hearing that he conducted a "probation search" of defendant's residence after his arrest.

the jury, she described defendant's participation in the robbery/assault incident and during this narrative commented, "Every party [defendant] goes to, he ends up robbing somebody."

To show ineffective representation, the defendant must establish that counsel's performance fell below an objective standard of reasonableness, and that there is a reasonable probability that absent counsel's deficiency the result would have been different. (*People v. Weaver* (2001) 26 Cal.4th 876, 925.) There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and on appeal we will not find ineffective assistance unless there could be no conceivable tactical reason for counsel's acts or omissions. (*Id.* at pp. 925-926.) Further, if the record does not show prejudice from counsel's alleged deficiency, we may reject the claim without determining whether counsel's performance was deficient. (*People v. Sapp* (2003) 31 Cal.4th 240, 263.)

The record reflects that defense counsel may have tactically refrained from objecting to Wagner's statement to her father during the photo lineup. On cross-examination of Detective Castro, defense counsel elicited Castro's acknowledgement that during an interview conducted several hours before the photo lineup, Wagner made no mention that she recognized one of the assailants in the robbery/assault incident as the male who had stolen her wallet at a previous party. Defense counsel could have reasonably assessed that Wagner's statement about the wallet theft, indicating that she knew defendant but when first interviewed failed to tell Detective Castro about his

13

presence at the robbery/assault incident, was useful impeachment evidence concerning her subsequent identification of defendant as a participant in the robbery/assault offenses.

In any event, the admission of these two statements by Wagner and Wells was not prejudicial. For purposes of evaluating the gang enhancements and defendant's state of mind, the jury was presented with a gang expert's testimony describing defendant's prior participation in a robbery in 2009 and a robbery and assault in 2011. In light of this other evidence showing defendant's gang-related criminal activities, there is no reasonable likelihood the jury's perception of defendant was significantly impacted by Wagner's and Wells's brief statements referencing his commission of a wallet theft and tendency to commit robberies at parties. Also, there was strong evidence that defendant was a perpetrator in the charged backpack theft and robbery/assault incidents. For the backpack thefts, he was identified by two witnesses (Perez and Kuy) as the perpetrator, and an identification card of one of the victims was found in his bedroom. For the robbery and assaults, he was identified by three witnesses (Wagner, Wells, and Phillips) as a participant; he exchanged text messages with Phillips supporting that he was involved; and he was depicted in a photo taken the night of the offenses wearing a distinctive shirt that matched a victim's description of one of the assailants. There is no reasonable probability the passing comments by Wagner and Wells affected the jury's verdict.

14

DISPOSITION

The judgment is affirmed.


HALLER, J.

WE CONCUR:


BENKE, Acting P. J.


O'ROURKE, J.